O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MARIA FRANCO, | ) | Case No. EDCV 07-946-VAP (JCRx) |
| Plaintiff, | ) | |
| | ) | **[Motion filed on July 31, 2008]** |
| v. | ) | |
| | ) | |
| PIER 1 IMPORTS, INC., ROE CORPORATION and DOES 1 through 20, | ) | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | ) | |

Defendant's Motion for Summary Judgment came before the Court for hearing on September 8, 2008.  After reviewing and considering all papers filed in support of, and in opposition to, the Motion, as well as the arguments advanced by counsel at the hearing, the Court GRANTS the Motion.

## I. BACKGROUND

On June 22, 2007, Plaintiff Maria Franco filed a Complaint ("Compl.") in the California Superior Court for the County of San Bernardino, naming Defendant Pier 1

Imports (US) Inc. and alleging claims for breach of contract and disability discrimination in violation of California Government Code § 12940.  Defendant removed the case to the U.S. District Court on July 27, 2007, on the basis of diversity jurisdiction.  28 U.S.C. § 1332.

On July 31, 2008, Defendant Pier 1 Imports (US) Inc. filed a Motion for Summary Judgment ("Mot."), a Statement of Undisputed Material Facts ("Def.'s UMF"), the Declaration of Camille Green ("Green Decl."), the Declaration of Russell D. Cawyer ("Cawyer Decl."), the Declaration of Suzanne M. Coghlan ("Coghlan Decl."), the Declaration of Rudy Rios ("Rios Decl."), the Declaration of Michael A. Moit ("Moit Decl."), the Declaration of Patty Rebeil ("Rebeil Decl."), the Declaration of Joe Bowe ("Bowe Decl."), in addition to an Appendix of four exhibits.

On August 23, 2008, Plaintiff filed an Opposition ("Opp'n"), Supplemental Objections and Opposition to Defendant's Undisputed Facts,[1] Plaintiff's Statement of Genuine Issues ("Pl.'s SGI"), the Declaration of Maria Franco ("Franco Decl."), the Declaration of Carroll A.

---

[1] Plaintiff failed to file an itemized opposition to Def.'s UMF responding to each enumerated Undisputed Material Fact.  The Court will construe Plaintiff's "Supplemental Objections and Opposition to Defendant's Undisputed Facts" as such an opposition.  All Undisputed Material Facts not "objected to" or "opposed" by Plaintiff in this document are deemed uncontroverted.

1  McCortney ("McCortney Decl."), and Supplemental

2  attachments to the McCortney Decl., including twelve

3  exhibits.[2]

4

5      On August 29, 2008, Defendant filed a response to

6  Plaintiff's objections to Defendant's undisputed material

7  facts and supporting evidence ("Def.'s Resp. to Pl's

8  Obj."), a response to Plaintiff's statement of genuine

9  issues ("Def.'s Resp. to Pl.'s SGI"), and objections to

10 the declaration of Carroll A. McCortney and Maria Franco

11 ("Def.'s Objections").

12

13                  **II. LEGAL STANDARD**

14     A motion for summary judgment shall be granted when

15 there is no genuine issue as to any material fact and the

16 moving party is entitled to judgment as a matter of law.

17 Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc.,

18 477 U.S. 242, 247-48 (1986).  The moving party must show

19 that "under the governing law, there can be but one

20

21 _____

22     [2] Plaintiff also attached an unnumbered thirteenth
   exhibit which appears to be excerpts of the deposition
23 transcript of Rudy Rios.  Plaintiff failed to include a
   sworn Reporter's Certificate.  See Orr v. Bank of
24 America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002)
   ("Authentication is a condition precedent to
25 admissibility . . . . [U]nauthenticated documents cannot
   be considered in a motion for summary judgment.")
26 (citations and footnotes omitted); Cristobal v. Siegel,
   26 F.3d 1488, 1494 (9th Cir. 1994); Canada v. Blain's
27 Helicopters, Inc., 831 F.2d 920, 925 (9th Cir. 1987).
   Defendant has not objected to the unauthenticated Rios
28 deposition transcript, however, so the Court will
   consider it.

                        3

reasonable conclusion as to the verdict."  <u>Anderson</u>, 477
U.S. at 250.

Generally, the burden is on the moving party to
demonstrate that it is entitled to summary judgment.
<u>Margolis v. Ryan</u>, 140 F.3d 850, 852 (9th Cir. 1998);
<u>Retail Clerks Union Local 648 v. Hub Pharmacy, Inc.</u>, 707
F.2d 1030, 1033 (9th Cir. 1983).  The moving party bears
the initial burden of identifying the elements of the
claim or defense and evidence that it believes
demonstrates the absence of an issue of material fact.
<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

Where the non-moving party has the burden at trial,
however, the moving party need not produce evidence
negating or disproving every essential element of the
non-moving party's case.  <u>Celotex</u>, 477 U.S. at 325.
Instead, the moving party's burden is met by pointing out
that there is an absence of evidence supporting the non-
moving party's case.  <u>Id.</u>

The burden then shifts to the non-moving party to
show that there is a genuine issue of material fact that
must be resolved at trial.  Fed. R. Civ. P. 56(e);
<u>Celotex</u>, 477 U.S. at 324; <u>Anderson</u>, 477 U.S. at 256.  The
non-moving party must make an affirmative showing on all
matters placed in issue by the motion as to which it has

4

the burden of proof at trial.  <u>Celotex</u>, 477 U.S. at 322;

<u>Anderson</u>, 477 U.S. at 252.  <u>See also</u> William W.

Schwarzer, A. Wallace Tashima & James M. Wagstaffe,

<u>Federal Civil Procedure Before Trial</u> § 14:144.


### III. EVIDENTIARY OBJECTIONS

The Court addresses only those objections to factual allegations that are material to its determination of the motion.


**A.  Plaintiff's Objections**[3]

Plaintiff objects to Def.'s UMF ¶ 10[4] on three grounds: it is inadmissible opinion, there is a lack of foundation, and it "is irrelevant with respect to Defendant's employees."  The Court overrules these objections.  The declarations of Rudy Rios and Camille Green sufficiently lay foundation, given each employee's considerable length of employment in the industry.  (<u>See</u> Rios Decl.; Green Decl.)  Given their experience, they

---

[3] Rather than making separate evidentiary objections and also responding to the defense's Proposed Undisputed Material Facts, Plaintiff poses evidentiary objections to several paragraphs in Def.'s UMF.  The Court construes these as objections to the evidence cited in support of the particular Undisputed Material Facts.

[4] Def's UMF ¶ 10 states: "[i]ndeed it is customary that non-unionized employees in the transportation, logistics and warehousing industry maintain at-will employment relationships with their employees and are not employment relationships that can only be terminated for good cause."  Defendant cites the Green Decl. ¶ 18 and Rios Decl. ¶ 12 as authority for this proposition.

are qualified to opine as to the customary practices in their industry.  Also, as Defendant points out, the evidence is relevant to the factors the Court may consider regarding Plaintiff's implied employment agreement claim.  See Foley v. Interactive Data Corp., 47 Cal.3d 654, 680 (1988).

Plaintiff also objects to Def.'s. UMF ¶¶ 28 (describing March 15, 2006 internal memorandum for Plaintiff's poor performance), 29 (discussing contents of March 15, 2006 memorandum), 30 (same), 31 (same), 32 (same), 33 (same), 35 (meeting with Ms. Green regarding Plaintiff's inappropriate comments to employees), 36 (same), 38 (September 25, 2006 written counseling for poor performance, 39 (discussing specifics from September 26, 2006 counseling memorandum), 42 (September 26, 2006 Associate Corrective Action Documentation), 45 (October 28, 2006 mis-handling of dispute between employees), 46 (same), 47 (same), 48 (November 3, 2006 written corrective action for unsatisfactory job performance), 49 (describing November 3, 2006 written corrective action), and 50 (same), all on the relevance grounds.  Plaintiff argues that these facts relate to her performance history at Pier 1 and do not relate to any reason given for her termination in January of 2007.  Plaintiff's own deposition testimony directly contradicts this assertion. (Franco Dep. 231:21-25, 232:1-2 ("substandard performance

1   and failure to open the distribution center on ...

2   January 4, 2007" were only reasons given to Plaintiff for

3   her discharge.)   Plaintiff conceded she was discharged

4   due to her poor performance and because of her failure to

5   open the distribution center.  (<u>Id.</u>)  Plaintiff's

6   objection lacks merit because the facts relating to her

7   substandard job performance are relevant to whether or

8   not Pier 1 had a nondiscriminatory basis for its decision

9   to discharge Plaintiff.

10

11       Plaintiff objects to Def.'s UMF ¶ 62[5] on the grounds

12  that it is an "argumentative conclusion by Defendant,

13  rather than a statement of fact."  Plaintiff testified at

14  her deposition that she could have opened the door to the

15  distribution center and returned home on the morning of

16  January 4, 2007, but that she did not realize that was an

17  option until Ms. Green informed her of that possibility

18  when they met on January 5, 2007.  (Franco Dep. 308:15-

19  20.)  This testimony supports an inference that Plaintiff

20  could have worked her scheduled shift, as stated in

21  Def.'s UMF ¶ 62.  This reasonable inference does not

22  constitute an "argumentative conclusion."  Thus,

23  Plaintiff's objection is overruled.

24  ///

25  ///

26  _____

27       [5] Def's UMF ¶ 62 states: "However, Plaintiff decided
    not to work her scheduled shift, even though she concedes
28  she could have done so."

1    Plaintiff objects to Def.'s UMF ¶ 76[6] on the grounds

2    that it is an "argumentative conclusion by Defendant,

3    rather than a statement of fact, meaningless as stated."

4    The Court overrules this objection.

5

6    Finally, Plaintiff objects to Def.'s UMF ¶ 85[7] on the

7    ground that it is hearsay and a "conclusionary statement

8    reported by a non-percipient witness."  The statement

9    constitutes "after-acquired evidence" because it was

10   discovered during Plaintiff's deposition; it was not

11   known by Defendant at the time of Plaintiff's discharge.

12   See McKennon v. Nashville Banner Pub. Co., 513 U.S. 352,

13   362-63 (1995) (After-acquired evidence is relevant if it

14   is "evidence of wrongdoing that would have led to

15   termination on legitimate grounds had the employer known

16   about it."  Id. at 362.)  Contrary to Plaintiff's

17   objection, it matters not a whit that Ms. Green, whose

18   declaration is cited as support for Def.'s UMF ¶ 85, was

19   not present during Plaintiff's deposition.  (See Franco

20   Decl. 3:15-17.)  Plaintiff's admission that she had

21   already returned home at the time she left a voicemail

22   message for Ms. Green on January 4, 2007, constitutes an

23

24   _____

25   [6] Def's UMF ¶ 76 states: "Plaintiff said she had a
     choice to make and she chose her brother."

26
27   [7] Def's UMF ¶ 85 states: "During this meeting,
     Plaintiff misrepresented that she left a voicemail
     message for Green when she was on the way to taking her
28   brother to the hospital."

8

admission by a party opponent.  <u>See</u> Fed. R. Evid.
801(d)(2).

**B. Defendant's Objections**

     Defendant objects to the Franco and McCortney
declarations because they are "not sworn and made under
penalty of perjury."  (Def.'s Objections.)  The original
declarations, filed electronically, apparently are
unsigned, although the courtesy copies delivered to
chambers bear (copied) signatures.  The Court assumes for
the purposes of this order that Plaintiff's counsel will
correct the oversight and re-file signed original
declarations.

     Additionally, Defendant objects to ¶ 10 of the Franco
Decl. on the grounds of hearsay, lack of foundation,
personal knowledge and competency.  The Court overrules
the Defendant's objections with respect to the sentence
"[i]n September and October, 2005, I was taken off work
by my treating physician, who diagnosed my condition as
chronic fatigue, nerves, low blood count, and a small
ulcer."  The Court considers this statement only for its
non-hearsay purpose of showing Plaintiff's state of mind.
<u>See</u> Fed. R. Evid. 803(3).  With respect to Defendant's
objection the statement "[s]uch information was
communicated to Defendant by my doctor," this objection
is sustained on the ground of lack of foundation.

1    Defendant also objects to ¶ 14 of the Franco Decl. on
2  the grounds that it directly contradicts Plaintiff's
3  sworn deposition testimony.  Plaintiff testified at her
4  deposition that none of Defendant's employees ever said
5  anything negative about (1) her medical condition, (2)
6  her need to take time off to attend medical appointments,
7  or (3) her leave of absence.  (Franco Dep. 192:8-25,
8  193:1-20.)  Plaintiff also testified that her co-workers
9  and supervisors were always supportive of her and seemed
10  sincere and caring towards her.  (Id.)

11

12    In her declaration submitted in opposition to this
13  Motion, Plaintiff states that Camille Green commented on
14  January 5, 2007 that "with all that is going on with your
15  medical condition, maybe the best thing for you is not to
16  be working for Pier 1."  (Franco Decl. ¶ 14.)  Defendant
17  argues that this statement directly contradicts
18  Plaintiff's deposition testimony.

19

20    Typically, a party cannot create an issue of fact
21  through a declaration contradicting his or her own
22  deposition testimony.  See Cleveland v. Policy Mgmt. Sys.
23  Corp., 526 U.S. 795, 806 (1999); Block v. City of Los
24  Angeles, 253 F.3d 410, 419, n. 2 (9th Cir. 2001).
25  Nevertheless, the Court overrules Defendant's objection
26  because the two statements are not sufficiently
27  contradictory.  Drawing all reasonable inferences in
28

10

favor of the Plaintiff, the non-moving party, the Court finds Ms. Green's alleged statement not necessarily a "negative" or "unsupportive" comment such that the statement would contradict Plaintiff's deposition testimony clearly.  Accordingly, the Court construes the alleged statement (to the extent it is relevant) in a fashion consistent with Plaintiff's deposition, i.e., "positive" and "supportive."

## IV. UNCONTROVERTED FACTS

The following material facts are supported adequately by admissible evidence and are uncontroverted.  They are "admitted to exist without controversy" for the purposes of this Motion.  <u>See</u> Local Rule 56-3.

## A.  Hiring of Plaintiff

In April 2004, Plaintiff called and spoke with employees at Defendant Pier 1's[8] Ontario distribution center, seeking information about openings for a management position.  (Franco Decl. ¶ 2; Def's. UMF ¶ 3-5.)  Over the course of a few weeks, Plaintiff spoke over the telephone with Defendant's employees Sherrie McCoy, Patti Rebeil, and Harry Jiminez about the job opening and

---

[8] Pier 1 sells "unique home furnishings" and "operates retail stores throughout the United States." (Def.'s UMF ¶ 1.)  "To supply its retail stores, Pier 1 operates seven distribution centers throughout the United States, including one located in Ontario, California." (Def.'s UMF ¶ 2.)

11

1   Plaintiff's prior work experience.  (Franco Decl. ¶ 3.)

2   None of these employees discussed any terms or conditions

3   of any prospective employment.  (Def's UMF ¶ 4.)

4

5        On April 21, 2004, Plaintiff completed and signed an

6   employment application for the supervisor position at

7   Defendant's Ontario Distribution center.  (Def's UMF ¶ 6;

8   Franco Decl. ¶ 5; Pl. Ex. 2.)  The following language

9   appeared on the application directly above Plaintiff's

10  signature line: "[a]ny offer of employment, and

11  acceptance thereof, does not constitute a binding

12  contract of any length, and that such employment is

13  terminable at the will of either party...." (Id.)

14

15       On that same day, Plaintiff interviewed with Kevin

16  Rooney, the Distribution center Manager, and Michael

17  Moit, the Distribution Supervisor.  (Franco Decl. ¶ 3;

18  Def's UMF ¶ 8.)  During that personal interview, neither

19  Moit nor Rooney made any representations to Plaintiff

20  that her employment with Defendant could only be

21  terminated for good cause.  (Franco Dep. 105:11-17, 113:

22  7-11, 115:20-23; Def's UMF ¶ 9.)  Following the

23  interview, in May 2004, Patti Rebeil, Defendant's

24  Director of Organizational Development, called Plaintiff

25  and offered her the position of first shift supervisor,

26  starting June 1, 2004.  (Franco Decl. ¶ 6; Franco Dep.

27  116:3-13.)  Plaintiff accepted the position.  (Id.)

28

On May 12, 2004, Julie Brake, Defendant's Staffing Manager, wrote a letter to Plaintiff, confirming Defendant's offer of employment and Plaintiff's acceptance. (Pl. Ex. 3; Def's UMF ¶ 13.)  The letter contained information regarding Defendant's Management Incentive Plan, employee benefits program, accrual rate of vacation time, and eligibility for annual performance reviews. (Id.)  The letter also stated: "[t]his offer is contingent upon the favorable completion of a criminal background screen, physical and drug screen." (Id.)  Nothing in the letter stated that Plaintiff's employment with Defendant was subject to termination at the will of the employer or that termination would only be for good cause. (Id.)

On May 12, 2004, Plaintiff completed Defendant's Pre-Placement Examination Questionnaire, which required Plaintiff to disclose her medical history. (Def's UMF ¶ 16-17; Def. App. 107.)  Plaintiff indicated "yes" as to two questions: (1) "Do you wear or have you ever worn glasses?" and (2) "Do you or have you ever worn contacts?" (Id.)  Plaintiff denied any other medical problems. (Id.)

Plaintiff began her employment as an order filling supervisor with Defendant on June 1, 2004. (Franco Dep. 109:5-6; Def's UMF 18.)

**B.   Employee Handbook**

Plaintiff received a copy of Defendant's Associate Handbook on June 18, 2004.  (Franco Dep. 258: 18-24; Def. App. 124; Def's UMF 19.)  The Handbook stated in several places that Defendant was an at-will employer. (Def. App. 130 (Handbook page 4) ("Except where expressly and specifically superceded by state law, Pier 1 Imports is an at-will employer and reserves the right to terminate the employment of any associate for any reason with or without past record of corrective action."); Def. App. 133 (Handbook page 62) (same); Def. App. 136 (Handbook page 68) (same); Def. App. 135 (Handbook page 64) ("Satisfactory completion of the orientation period does not alter the at-will nature of your employment with Pier 1 in any way."); Def's UMF ¶ 20.)  None of Defendant's employees ever stated that Plaintiff's employment was not at-will, or rather terminable only for good cause. (Franco Dep. 262: 2-5; Def's UMF ¶ 21.)

In its Associate Code of Conduct and Associate Counseling/Corrective Action sections, the handbook included non-exhaustive lists of grounds for corrective action, up to and including discharge.  (Def. App. 131-134 (Handbook pages 60-63).)

///

///

///

## C. Performance Reviews

On April 27, 2005, Plaintiff received a DC Salaried Performance Review for the review period of March 1, 2004 through March 1, 2005.  (Pl. Ex. 5; Def's UMF ¶ 22.)  On this review, Plaintiff's overall rating was "Good." (<u>Id.</u>)  She received an "Unsatisfactory" rating in the categories of safety, foreign and domestic service, quality, and cost, five of the ten measured categories. (<u>Id.</u>)  She received a "Needs development" rating regarding "Top SKU service" and "all deliveries service," two of the ten measured categories.  (<u>Id.</u>)  She received "Good" ratings in "Living the Values" and "Plays Well on the Team," two of the ten measured categories.  (<u>Id.</u>)

On April 26, 2006, Plaintiff received a DC Salaried Performance Review for the review period of March 1, 2005 through March 1, 2006.  (Def. Ex. 7; Def's UMF ¶ 25.)  On this review, Plaintiff's overall rating was "Good." (<u>Id.</u>)  She received no "Unsatisfactory" ratings.  (<u>Id.</u>) She received a rating of "Needs Development" in the categories of safety, all deliveries, foreign and domestic service, quality, and cost, six of the ten measured categories.  (<u>Id.</u>)  She received a rating of "Very Good" in the categories of "Living the Values" and "Plays Well on the Team," two of the ten measured categories.  (<u>Id.</u>)  She received a rating of

"Outstanding" in the category of "Top SKU service," one of the ten measured categories.  (Id.)

On March 15, 2006, Plaintiff received a memorandum from Mike Moit regarding her poor job performance, noting numerous injuries sustained by employees during Plaintiff's shift as supervisor.  (Def. Ex. 8; Def's UMF ¶ 28.)  The memorandum memorialized meetings held between Rudy Rios, Suzanne Coghlan, Mike Moit, and Plaintiff regarding the problems, and listed five major points which the management team stated Plaintiff "need[ed] to work on."  It also attached notes from the meetings and a list of the "Day shift Order-filling Supervisor Requirements."  (Id.)

On September 25, 2006, Plaintiff received an internal memorandum regarding her job performance from Camille Green, the operations manager of Defendant's Ontario distribution center, Plaintiff's immediate supervisor.  (Def. Ex. 9; Def's UMF ¶ 38.)  Ms. Green outlined four main problem areas in which Plaintiff needed to improve, including her ability to resolve small systematic issues instead of relying on system specialists, arriving at an appropriate time for her shift, determining the scheduling needs of her department, and maintaining a strong presence among the employees she supervised.  (Id.)

On September 26, 2006, Plaintiff was given an "Associate Corrective Action Documentation" form from Camille Green. (Def. Ex. 11; Def's UMF ¶ 42.) The reason Plaintiff was told she needed to take corrective action was "unsatisfactory job performance," i.e., her failure to complete timely associate performance appraisals for subordinate employees. (Id.) Ms. Green also stated on the form, "Please note that failure to comply with this requirement may result in further corrective action, up to and including termination." (Id.)

Thus, as of September 2006, Plaintiff was aware that her supervisor, Camille Green had serious concerns about her job performance, and she had been warned that she might be discharged unless her performance improved. (Franco Dep. 164:23-25; 165:1; Def's UMF ¶ 44.)

On November 3, 2006, Plaintiff received another internal memorandum from Camille Green regarding her "unsatisfactory job performance." (Pl. Ex. 8; Def's UMF ¶ 48.) In this memorandum, Ms. Green stated, "Maria, you are being given this written corrective action [warning] to communicate to you that your performance as a Distribution center Supervisor is below Pier 1's standards and expectations. Over the past several months there have been several conversations regarding your

performance.  We have spoken about leadership, decision-making, communication, and demonstrating functional knowledge in Order Filling." (<u>Id.</u>)  The memorandum then documented incidents of Plaintiff's poor performance in March 2006, June 2006, September 2006, and October 2006. (<u>Id.</u>)  Finally, the memorandum stated: "[f]ailure to bring your performance up to the minimum expectation will result in further corrective action, up to and including termination." (<u>Id.</u>)

**D. Other Performance Issues Regarding Plaintiff**

In June 2006, Ms. Green counseled Plaintiff regarding inappropriate comments she made to  two subordinate employees. (Def.'s UMF ¶ 35.[9])  Ms. Green advised Plaintiff to be more mindful in the future of her comments made in the presence of associates. (Def's UMF ¶ 36.)

On October 28, 2006, Plaintiff attempted to handle a dispute between two of her subordinate employees; the dispute grew out of control and Plaintiff was unable to resolve it. (Def.'s UMF ¶ 45-47.)

///

///

---

[9] Plaintiff did not recall during her deposition who had counseled her after this incident, but she did recall being counseled for the manner in which she handled it. (Def.'s UMF ¶ 37.)

1    In late 2006, Plaintiff received approximately two
2    calls from the alarm company that monitors Defendant's
3    Ontario distribution center.  (Def.'s UMF ¶ 52.)  Pier 1
4    supervisors bore the responsibility to respond to such
5    calls on a rotating basis.  (Def.'s UMF ¶ 53.)  On those
6    occasions, Plaintiff failed to respond to the calls when
7    it was her responsibility to do so.  (Def.'s UMF ¶ 54.)

8

9    **E.   Plaintiff's Medical Condition**

10   After May 2005, Plaintiff began experiencing chronic
11   fatigue.  (Franco Decl. ¶ 10.)  Before September 13,
12   2005, Plaintiff told Suzanne Coghlan, Human Resources
13   Manager, that she did not feel well.  (Pl. Ex. 12.)  From
14   September through October 2005, Plaintiff was taken off
15   work by her treating physician.  (Franco Decl. ¶ 10; Pl.
16   Ex. 12.)  Plaintiff states in her declaration that she
17   was diagnosed as having "chronic fatigue, nerves, low
18   blood count, and a small ulcer."  (Franco Decl. ¶ 10.)
19   Plaintiff communicated her chronic fatigue diagnosis to
20   Mr. Moit, who was the Operations Manager.  (Franco Decl.
21   ¶ 10; Pl. Ex. 12.)

22

23   Plaintiff told Ms. Green, her then-Operations
24   Manager, that she was ill and was seeking medical
25   attention and testing to determine the cause of her
26   illness.  (Franco. Decl. ¶ 11-12; Pl. Ex. 12.)
27   Specifically, Plaintiff told Ms. Green that she had
28

1  undergone a bone marrow test.  (Franco Decl. ¶ 12; Pl.

2  Ex. 12.[10])

3

4  **F.  Failure to Open the Distribution Center on January 4,**

5      **2007**

6      On January 4, 2007, Plaintiff failed to open the

7  distribution center at 4:30 a.m., as scheduled ("the

8  January 4 incident").  (Franco Decl. ¶ 13; Franco Dep.

9  58:20-25, 59:1-15.)  At or around 12:45 a.m., Plaintiff

10 called Ms. Green asking that someone else open the

11 distribution center, stating she had a family emergency

12 to attend to.  (Franco Decl. ¶ 13; Def. Ex. C; Green

13 Decl. ¶ 10.)  Ms. Green did not answer her telephone, so

14 Plaintiff left her a voicemail message.  (Id.)

15 Defendant's "Absence, Tardiness and Leaving Early"

16 policy, documented in its Associate Handbook, requires

17 employees to notify their supervisors personally of any

18 anticipated absences; leaving messages with co-workers is

19 prohibited expressly.  (Def.'s UMF ¶¶ 63, 64.)

20

21  _____

22      [10] The parties dispute when Plaintiff informed Ms.
    Green of her illness and her need for medical testing.
23  Plaintiff testified she informed Ms. Green in November
    2006 of the deterioration of her health (Franco Decl.
24  3:22-28), then in December 2006 of her bone marrow test
    (Franco Decl. 4:4-8), and finally on January 5, 2007, of
25  the results of the bone marrow test, which required her
    to take oral medication for one month and undergo more
26  testing on February 5, 2007, and perhaps need future
    hospitalization.  (Franco Decl. 4:8-14.)  Defendant only
27  admits that Ms. Green knew of Plaintiff's medical
    complications "sometime after February 2006."  (Pl. Ex.
28  12.)  The Court addresses this dispute in section
    VI(B)(3).

1     Plaintiff then called Phillip Ceballos, the night
2 shift operations manager at the Distribution center who
3 was working at that time, and informed him she would not
4 be opening the center by 4:30 a.m. (Franco Decl. ¶ 13;
5 Green Decl. ¶ 9; Franco Dep. 309:14-23.) Mr. Ceballos
6 attempted to contact another day supervisor on behalf of
7 Plaintiff but was unsuccessful, so he opened the center
8 himself and continued to work until he was relieved by
9 another supervisor. (Franco Decl. ¶ 13; Franco Dep.
10 309:24-25, 310:1-3; Green Decl. ¶ 9.)

11

12     On January 5, 2007, Plaintiff spoke with Ms. Green
13 regarding the January 4 incident. (Green Decl. ¶ 12;
14 Franco Decl. ¶ 14.) Ms. Green asked Plaintiff what
15 measures she had taken to ensure her responsibility to
16 open the distribution center would be covered by another
17 employee and told her she would discuss the matter again
18 with Plaintiff after Ms. Green had the opportunity to
19 talk with Rudy Rios, the distribution center Manager, and
20 Ms. Coghlan. (Green Decl. ¶ 14.)

21

22     On January 8, 2007, Plaintiff met with Mr. Rios and
23 Ms. Coghlan regarding the January 4 incident. (Franco
24 Decl. ¶ 15.)
25 ///
26 ///
27 ///
28

**G.   Reggie Smith's Failure to Open Distribution Center**

Reggie Smith, a weekend manager at Defendant's Ontario distribution center, also had failed to open the distribution center once because he "inadvertently overslept," but nevertheless reported to work one hour late.  (Moit Dec. ¶ 9.)  Mr. Smith was not disciplined for this failure to open the distribution center.  (<u>Id.</u> at ¶ 11.)  Mr. Smith had been employed by Defendant for eight years and had a good performance record.  (<u>Id.</u> at ¶ 11.)  Before the single instance when he failed to open the distribution center timely, Mr. Smith "had already been selected to transfer to Pier 1's new Distribution Center in Du Pont, Washington."  (<u>Id.</u>)

**H.   Plaintiff's Discharge**

On January 11, 2007, Defendants discharged Plaintiff upon the recommendation of Rudy Rios.  (Franco Decl. ¶ 18; Rios Decl. ¶ 7; Green Decl. ¶ 17.)  Ms. Green and Mr. Rios told Plaintiff she was being discharged because of (1) her failure to open the distribution center on January 4, 2007 and (2) her prior poor work performance. (Franco Dep. 231:9-25, 232:1-7; Green Decl. ¶ 17.)

///

///

///

///

///

1

**V. DISPUTED FACTS**

2       The following material facts are disputed by the

3  parties.

4

5       Although the parties agree that Plaintiff and Ms.

6  Green met on January 5, 2007, to discuss Plaintiff's

7  failure to open the distribution center at her scheduled

8  shift time, their versions of that discussion differ.

9  (Def.'s UMF ¶ 73.)  Plaintiff stated in her declaration

10 that during this meeting she discussed the results of her

11 bone marrow test, her medication regimen, and the

12 potential for future hospitalization.  (Franco Decl. ¶

13 12.)  According to Plaintiff, in response Ms. Green

14 stated: "with all that is going on with your medical

15 condition, maybe the best thing for you is not to be

16 working for Pier 1."  (Franco Decl. ¶ 14.)

17

18      Defendant counters this version of the conversation

19 with Plaintiff's testimony at her deposition, where she

20 testified that no Pier 1 employee ever said anything

21 negative about her medical condition, her need to attend

22 medical appointments, or her leave of absence.  (Franco

23 Dep. 192:19-25, 193:1-5.)

24

25      Further, Defendant admits that Ms. Green knew about

26 Plaintiff's bone marrow test and possible need for

27 additional medical leave in the future.  (Def.'s Resp. To

28

Pl.'s SGI.)  Plaintiff stated in her declaration she
informed Ms. Green of this information on January 5,
2007, approximately one week before her discharge.
(Franco Decl. ¶ 12.)  In other words, the parties dispute
proximity between the disclosure of Plaintiff's medical
condition, and the date of her discharge.

## VI. DISCUSSION

**A.   Claim for Breach of Implied Contract to Terminate
       Only for Good Cause**

Defendant argues that Plaintiff was an at-will
employee and could be terminated at any time, with or
without cause.  (Mot. at 3.)  Plaintiff contends she had
an implied contract with Defendant that she could be
terminated only for good cause.  (Opp'n at 2.)

Under California law, "[a]n employment, having no
specified term, may be terminated at the will of either
party on notice to the other."  Cal. Lab. Code § 2922
("section 2922").  California courts have interpreted
section 2922 as establishing "a presumption of at-will
employment if the parties have made no express oral or
written agreement specifying the length of employment or
the grounds for termination."  <u>Alexander v. Nextel
Commc'ns, Inc.</u>, 52 Cal. App. 4th 1376, 1380 (1997).
///
///

1    The at-will presumption may be "overcome by evidence
2    that the employer and employee impliedly agreed to
3    termination only for cause." <u>Alexander</u>, 52 Cal. App. 4th
4    at 1380.  "The existence of an implied contract to
5    discharge only for good cause is normally a factual
6    question for the trier of fact." <u>Id.</u> at 1381.  The
7    issue, however, can be decided as a matter of law "where
8    a valid contract expressly provided the employment was
9    at-will." <u>Id.</u>

10

11    Courts may consider different types of evidence to
12   determine the existence of an implied "good cause"
13   contract, including the personnel policies or practices
14   of the employer; the employee's longevity of service;[11]
15   actions or communications by the employer reflecting
16   assurances of continued employment; and the practices of
17   the industry in which the employee is engaged.  <u>Foley</u>, 47
18   Cal.3d at 680; <u>Haycock v. Hughes Aircraft Co.</u>, 22 Cal.
19   App. 4th 1473, 1488 (1994).

20

21    In her deposition, Plaintiff admitted that she was an
22   at-will employee and that none of Defendant's employees
23   ever made any representations to her that were
24   inconsistent with this at-will status or that could

25

26   _____
       [11] Plaintiff does not rely on her relatively brief
27   two and one-half year tenure with Pier 1 as support for
     her contention that she had an implied-in-fact contract
28   not to be discharged except for good cause.

1   reasonably lead Plaintiff to a belief that she could be

2   terminated only for good cause.  (Franco Dep. 260:25,

3   261:1-25, 262:1-5.)  For example, during Plaintiff's

4   deposition, Defense counsel introduced as exhibits

5   certain portions of Pier 1's Associate Handbook, which

6   Plaintiff received on June 18, 2004.  (Def. App. 124;

7   Franco Dep. 258:14-24.)  Defense counsel then asked

8   Plaintiff:

9       Q:   "...Pier 1 made it very clear to you very early

10           on in your employment that all employment was

11           at-will and that you reserve the right to

12           discontinue your employment at anytime and Pier

13           1 reserved that same right; do you see that?

14      A:   Yes

15      Q:   And you knew that from at least the day that you

16           got the handbook; right?

17      A:   Yes.

18      Q:   And that's not the only place where it's in the

19           employee handbook. ... quote, Pier 1 Imports is

20           an at-will employer and reserves the right to

21           terminate the employment of any associate for

22           any reason with or without past record of

23           counseling or corrective action.  An associate

24           also has the right to terminate his or her

25           employment for any reason at anytime; is that

26           correct?

27      A:   Yes

28

26

1    Q:   You understood that; right?

2    A:   Yes.

3    Q:   And you understood that during your employment

4          with Pier 1; right?

5    A:   Yes.

6    Q:   And nobody ever did or said anything that was

7          not consistent with what was in the handbook;

8          correct?

9    A:   Correct."   (Franco Dep. 260:25, 261:1-25, 262:1-

10        5.)

11

12    Plaintiff attempts to controvert her admission by

13 testifying to the contrary in her declaration.   In

14 opposition to this motion, she declares that during her

15 interview with Mike Moit and Kevin Rooney, Kevin Rooney

16 "stated that the associates at the Ontario Distribution

17 center were 'very pampered,' some having been employed

18 there for 15 years or more, from which information I

19 understood that employees there would not be terminated

20 without good cause."   (Franco Decl. ¶ 3.)

21

22    This fails to raise a triable issue of fact for two

23 reasons.   First, even drawing all reasonable inferences

24 in Plaintiff's favor, as required, a statement that some

25 employees are "pampered" and have been employees for

26 fifteen years does not support the conclusion that

27 Plaintiff would not be discharged except for good cause.

28

1  Moreover, Plaintiff cannot attempt to controvert her
2  admission by stating contrary facts in her declaration.
3  See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. at
4  806; Block v. City of Los Angeles, 253 F.3d at 419 n.2.
5
6     Thus, Plaintiff has produced no evidence of an
7  implied contract between herself and Pier 1.  Her
8  argument that there was no express agreement between
9  herself and Pier 1 that could have rendered her an at-
10 will employee in unavailing as well, because California
11 law imposes a presumption of at-will status.
12
13    Plaintiff states in her declaration that no one at
14 Pier 1 told her about the at-will nature of the position
15 with Pier 1 when she sought information about the
16 available job at the Ontario distribution center, even
17 during her job interview.  (Franco Decl. ¶¶ 2, 3.)
18 Additionally, Plaintiff argues that no at-will term was
19 mentioned in the telephone call from Patti Rebeil,
20 Director of Organizational Development at Pier 1, who
21 offered Plaintiff the position.  (Id. at ¶¶ 6, 7.)
22 Plaintiff also stated that no at-will term was included
23 in the letters she received from Defendant's employee
24 Julie Brake.  (Id. at ¶ 8.)
25
26    This evidence is irrelevant.  Plaintiff cannot
27 overcome the statutory presumption of at-will employment
28

1    by attempting to show the absence of at-will terms in
2    documents and conversations before her employment with
3    Defendant.

4

5         Furthermore, before she interviewed for her job,
6    Plaintiff signed an employment application expressly
7    stating that Pier 1 was an at-will employer.  (See Def.'s
8    UMF ¶ 7.)  Such a conspicuous statement, directly above
9    the signature line on the application, placed Plaintiff
10   on notice of the nature of any future employment
11   relationship with Defendant.  See Harden v. Maybelline
12   Sales Corp., 230 Cal. App. 3d 1550, 1556 (1991) (at-will
13   clause in employer's pre-printed application construed as
14   evidence of ultimate agreement entered into between the
15   parties).[12]

16

17        Finally, Plaintiff attempts to controvert the fact of
18   her at-will employment status by offering deposition
19   testimony of Rudy Rios, Plaintiff's manager.  (Pl. Opp'n
20   at 5-6.)  It is not disputed that Mr. Rios was unaware of
21   any employee being discharged without cause at any point
22   during his own employment.  (Pl. SGI ¶ 8.)  It is also
23   undisputed that Mr. Rios himself never discharged any
24   Pier 1 employee without cause.  (Pl. SGI ¶ 9.)  In Guz v.

25

26        [12] Although Plaintiff cites this case, it actually
27   supports Defendant's proposition that the employment
     application's conspicuous at-will language is evidence of
28   the ultimate agreement between the parties.

1   Bechtel Nat., Inc., 24 Cal.4th 317 (2000), in opposition
2   to a motion for summary judgment, the plaintiff's counsel
3   offered deposition testimony of the company's president,
4   who stated it was his belief that workers were terminated
5   only for good cause, to show an implied contract for
6   termination only for good cause.  Guz, 24 Cal. 4th at
7   345.  There was "no evidence that [company] employees
8   were aware of such an unwritten policy" and such policy
9   was contrary to the company's "general disclaimer" of at-
10  will employment.  Id.  The Guz Court found the company
11  president's statement "insufficient as a matter of law to
12  permit a finding that the company, by an unwritten
13  practice or policy on which employees reasonably relied,
14  had contracted away its right to discharge [Plaintiff] at
15  will."  Id.  Having found no unwritten policy for good
16  cause termination, the Guz Court then turned to the
17  company's written policies and found there were formal
18  written company policies upon which the plaintiff could
19  rely to create a genuine issue of material fact on an
20  implied contract for good cause termination claim.  Id.
21  at 345-46.

22

23      As in Guz, Plaintiff, in this case, offers the
24  deposition testimony of one of Defendant's employees,
25  Rudy Rios, a supervisor at the Ontario distribution
26  center, to raise a triable issue of fact as to whether
27  Plaintiff's employment was terminable only for good
28

1  cause.   As in <u>Guz</u>, this deposition testimony, without

2  additional evidence that other Pier 1 employees were

3  aware of such an unwritten policy, is insufficient as a

4  matter of law to support a finding that Defendant

5  "contracted away its right to discharge [Plaintiff] at

6  will."   <u>Id.</u> at 345.   Plaintiff presents no such

7  additional evidence.   Turning to Defendant's written

8  personnel policies, each excerpted section of Defendant's

9  Associate Handbook presented by the parties contains

10  language that employment with Defendant is at-will, even

11  the pages describing progressive discipline.   <u>See</u>, <u>e.g.</u>

12  Pl. Ex. 1.[13]   Plaintiff could not rely on such written

13  policies reasonably and conclude that her employment was

14  _____

15        [13] Plaintiff's Ex. 1, page 68 of Defendant's
      Associate Handbook entitled "Associate Corrective
16     Action," states: "Associates who violate work rules or
      fail to meet performance standards may be given
17     corrective action.   Corrective action includes
      notification that their performance is below Pier 1's
18     standards and advisement of the actions they need to take
      to correct any performance deficiencies.

19
            The goal of corrective action is to assist associates
20     in bringing their performance up to Pier 1's standards
      and consistently maintaining that level of performance.
21     Informal conferences, verbal corrective action, written
      corrective action (Associate Corrective Action
22     Documentation) and performance reviews may be issued.
      Certain instances may warrant suspension without pay,
23     depending on the severity of the offense.   Investigative
      suspension with pay may also be utilized.   Failure to
24     improve performance to Pier 1's standards will lead to
      further corrective action, up to and including
25     termination of employment.

26          Pier 1 Imports is an at-will employer and reserves
      the right to terminate the employment of any associate
27     for any reason with or without past record or corrective
      action.   An associate also has the right to terminate
28     his/her employment for any reason at any time."

terminable only for good cause; Plaintiff, in fact,
understood she was an at-will employee.  (Franco Dep.
260:25, 261:1-25, 262:1-5.)

Viewing the "totality of circumstances," the Court
grants Defendant's summary judgment motion as to
Plaintiff's first claim in light of her failure to rebut
Defendant's evidence of the at-will employment
relationship, evidenced by: (1) the lack of any
assurances made by Defendant's employees that Plaintiff
could be dismissed only for good cause; (2) Plaintiff's
relatively short term of employment; and (3) Defendant's
employment application, containing conspicuous at-will
language.[14]  See Foley, 47 Cal.3d at 680.

In any event, Defendant had good cause to discharge
Plaintiff.  Plaintiff had a documented history of poor
performance and she admitted that Defendant's assessments
of her performance were accurate.  (See, e.g. Def.'s UMF
¶¶ 22, 24, 25, 27, 28, 34, 35, 38, 40, 42, 43, 44, 45,
48, 51, 54, 61, 62.)  Poor job performance constitutes
good cause for discharge.  See Knights v. Hewlett
Packard, 230 Cal. App. 3d 775, 780 (1991); see also Hoy
v. Sears, Roebuck & Co., 861 F. Supp. 881, 887 (N.D. Cal.

---

[14] The Court also finds persuasive the evidence of
customary practices that support Defendant's position
that Plaintiff's employment was at-will.  (See Green
Decl. ¶ 18; Rios Decl. ¶ 12.)

1   1994).   Thus, even though Plaintiff was an at-will

2   employee, Defendant had good cause to discharge her.

3

4        There is no genuine issue of material fact and the

5   moving party is entitled to judgment as a matter of law

6   on this claim.   Accordingly, the Court grants Defendant's

7   motion for summary judgment as to Plaintiff's breach of

8   implied contract claim.

9

10  **B.   Disability Discrimination**

11       Plaintiff's second claim alleges that Defendant

12  discriminated against her and terminated her employment

13  because of her medical condition.  (See Compl.)

14  Defendant denies this and submits declarations from its

15  employees that state Plaintiff was discharged because she

16  had a poor job performance record and failed to open the

17  distribution center on January 4, 2007.  (See, e.g.,

18  Green Decl.; Rios Decl.)  Plaintiff claims these

19  proffered reasons are pretextual.

20

21       The California Fair Employment and Housing Act

22  ("FEHA") prohibits an employer from discriminating

23  against an employee based on the employees's physical

24  condition or disability. The FEHA states:

25       "It shall be an unlawful employment practice, unless
         based upon a bona fide occupational qualification ...
26       [f]or an employer, because of ... physical
         disability, mental disability, [or] medical condition
27       ... of any person, to refuse to hire or employ the
         person or to refuse to select the person for a
28

1    training program leading to employment, or to bar or
2    to discharge the person from employment or from a
     training program leading to employment, or to
3    discriminate against the person in compensation or in
     terms, conditions, or privileges of employment."
     Cal. Gov. Code 12940(a).
4

5        "Title VII of the Federal Civil Rights Act of 1964 is

6    the federal counterpart to FEHA.  42 U.S.C. 2000(e), et.

7    seq.  [The court] may look to federal authority regarding

8    Title VII and similar civil rights statutes when

9    interpreting analogous statutory provisions of FEHA."

10   Rodriguez v. Airborne Express, 265 F.3d 890, 896 n.4 (9th

11   Cir. 2001).

12

13

14       In order to prevail, the employee first must

15   establish a prima facie case of discrimination.  See

16   Vasquez v. County of Los Angeles, 349 F.3d 634, 640 (9th

17   Cir. 2004)(citing Cordova v. State Farm Ins. Co., 124

18   F.3d 1145, 1148 (9th Cir. 1997)).  To establish a prima

19   facie case, the employee "must offer evidence that

20   'give[s] rise to an inference of unlawful

21   discrimination,' either through the framework set forth

22   in McDonnell Douglas v. Green, [411 U.S. 792 (1973),] or

23   with direct or circumstantial evidence of discriminatory

24   intent."  Vasquez, 349 F.3d at 640 (quoting Texas Dep't

25   of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).[15]

26       [15] Under the McDonnell Douglas framework, "unlawful
27   discrimination is presumed if the plaintiff can show that
     '(1) [she] belongs to a protected class, (2) [she] was
28                                        (continued...)

34

1    Proving a prima facie case for discrimination on the

2 grounds of physical disability under the FEHA requires

3 Plaintiff to show: (1) she suffers from a disability; (2)

4 she is otherwise qualified to do her job; and, (3) she

5 was subjected to adverse employment action because of her

6 disability.  See Arteaga v. Brinks, Inc., 163 Cal. App.

7 4th 327, 344-45 (2008) (quoting Faust v. California

8 Portland Cement Co., 150 Cal. App. 4th 864, 886 (2007))

9 (quotations omitted).

10

11    Once the plaintiff has established a prima facie

12 case, the burden shifts and the defendant must "provide a

13 legitimate, non-discriminatory reason for the employment

14 action."  Vasquez, 349 F.3d at 641.  The defendant need

15 offer only reasons that, "taken as true, would permit the

16 conclusion that there was a non-discriminatory reason for

17 the adverse action."  St. Mary's Honor Ctr., 509 U.S. at

18 ────────────────────────

19         [15](...continued)
performing according to [her] employer's legitimate

20 expectations, (3) [she] suffered an adverse employment
action, and (4) other employees with qualifications

21 similar to [her] own were treated more favorably.'"
Vasquez, 349 F.3d at 640 n.5 (quoting Godwin v. Hunt

22 Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir. 1998) and
citing McDonnell Douglas, 411 U.S. at 802).

23

24    Under the evidence-of-intent framework, the plaintiff
must present either direct evidence, that is, "'evidence

25 which, if believed, proves the fact [of discriminatory
animus] without inference or presumption,'" or

26 circumstantial evidence.  Vasquez, 349 F.3d at 640
(quoting Godwin, 150 F.3d at 1221) (alteration in

27 original).  A plaintiff relying on circumstantial
evidence alone will not succeed in establishing a prima

28 facie case if there is insufficient evidence of a causal
nexus.  See id. at 640-41.

509 (emphasis in original).  The defendant bears this
burden of production but the burden of persuasion remains
with the plaintiff:  "The defendant need not persuade the
court that it was actually motivated by the proffered
reasons. . . .  It is sufficient if the defendant's
evidence raises a genuine issue of fact as to whether it
discriminated against the plaintiff."  Burdine, 450 U.S.
at 254 (citing Bd. of Trs. of Keene State Coll. v.
Sweeney, 439 U.S. 24, 25 (1978)).

Once the Defendant has provided a "legitimate, non-
discriminatory reason for the employment action," then
the burden shifts back to the Plaintiff to show that this
articulated reason was "pretextual."  Vasquez, 349 F.3d
at 641.  "A plaintiff can show pretext directly, by
showing that discrimination more likely motivated the
employer, or indirectly, by showing that the employer's
explanation is unworthy of credence."  Id.  "To show
pretext using circumstantial evidence, a plaintiff must
put forward specific and substantial evidence challenging
the credibility of the employer's motives."  Id.

At the summary judgment stage, "the district court
must look at the evidence supporting the prima facie
case, as well as the other evidence offered by the
plaintiff to rebut the employer's offered reasons.  And,
in those cases where the prima facie case consists of no

1  more than the minimum necessary to create a presumption

2  of discrimination under <u>McDonnell Douglas</u>, plaintiff has

3  failed to raise a triable issue of fact." <u>Wallis v. J.R.</u>

4  <u>Simplot Co.</u>, 26 F.3d 885, 890 (9th Cir. 1994)(clarifying

5  the plaintiff's burden at the summary judgment stage as

6  set forth in <u>Sischo-Nownejad v. Merced Cmty. Coll. Dist.</u>,

7  934 F.2d 1104, 1111 (9th Cir. 1993)).  "Thus, the mere

8  existence of a prima facie case, based on the minimum

9  evidence necessary to raise a <u>McDonnell Douglas</u>

10 presumption, does not preclude summary judgment." <u>Id.</u>

11

12 **1.   Plaintiff's Prima Facie Case**

13      Plaintiff has satisfied her burden of showing a prima

14 facie case of employment discrimination.

15

16      **a. Plaintiff's Disability**

17      The FEHA defines a "physical disability"  as having a

18 medical condition that "limits" a "major life activity."

19 Cal. Gov. Code § 12926(k)(1)(A), (B).  "Limits" should be

20 construed as analogous to making the achievement of a

21 major life activity "difficult." <u>Id.</u> at (k)(1)(B)(ii).

22 "Major life activity" includes physical, mental, and

23 social activities, and working. <u>Id.</u> at (k)(1)(B)(iii).

24 "'[W]orking' is a major life activity, regardless of

25 whether the actual or perceived working limitation

26 implicates a particular employment or a class or broad

27 range of employments."  Cal. Gov. Code § 12926.1(c).

28

Whether a major life activity is limited "shall be
determined without regard to mitigating measures such as
medications ... or reasonable accommodations ...."  Cal.
Gov. Code § 12926(k)(1)(B)(I).

     Plaintiff can prove the disability element by showing
one of the following: (1) "[h]aving a record or history
of ... a [medical] condition ... which is known to the
employer"; (2) "[b]eing regarded or treated by the
employer ... as having, or having had, any physical
condition that makes achievement of a major life activity
difficult;" or (3) "[b]eing regarded or treated by the
employer ... as having, or having had, a ... [medical]
condition ... that has no present disabling effect but
may become a physical disability."  Cal. Gov. Code §
12926(k)(3)-(5).  Proving "[a]n actual or existing
disability is not necessary" to show a disability under
the FEHA.  <u>Arteaga</u>, 163 Cal. App. 4th at 345.

     Plaintiff states in her declaration that because she
worked  "excessive hours" she began to experience chronic
fatigue in May 2005.  (Franco Decl. ¶ 10.)  From
September 2005 through October 2005, Plaintiff's treating
physician ordered her taken off work.  (Franco Decl. ¶
10; Pl. Ex. 12 at 4.)  Plaintiff also states that she was
diagnosed with "chronic fatigue, nerves, low blood count,
and a small ulcer," and underwent further medical

1    testing, including a bone marrow test, to determine the

2    cause of her illness.  (Franco Decl. ¶¶ 10, 12.)

3    According to Plaintiff, "all treatments and testing had

4    been done around [her] work schedule, or [she] had

5    utilized vacation-approved time, in order to avoid

6    absence from work."  (Franco Decl. ¶ 14.)

7

8        Plaintiff also offers evidence that she had a medical

9    history known to her employer, the Defendant.  Cal. Gov.

10    Code § 12926(k)(3).[16]  Plaintiff does so by offering

11    evidence that her medical condition was known to several

12    of Defendant's employees.  Plaintiff informed Mike Moit,

13    the operations manager, about her condition of chronic

14    fatigue during the term of her employment.  (Franco Decl.

15    ¶ 10; Pl. Ex. 12 at 3.)  Suzanne Coghlan, the human

16    resources manager, knew of Plaintiff's medical condition

17    in September 2005.  (Pl. Ex. 12 at 4.)  After February

18    2006, Camille Green, Plaintiff's supervisor, knew of

19    Plaintiff's medical appointments and that Plaintiff had

20    undergone a spinal tap.[17]  (Id. at 3.)

21    ///

22

23    _____

       [16] Plaintiff has admitted that Defendant never
24    treated her as having a limitation in any life activity.
       (Franco Dep. 236:18-25, 237:1-2.)

25
       [17] Although Plaintiff testifies that she informed Ms.
26    Green in November 2006 about her medical appointments and
       the spinal tap she had undergone, Defendant admits only
27    that Ms. Green knew about Plaintiff's medical condition
       after February 2006.  (Franco Decl. ¶ 11, Pl. Ex. 12 at
28    3.)

1    Defendant argues that Plaintiff's admissions during
2  her deposition negate any showing of physical disability.
3  (Mot. at 11-12.)  Plaintiff testified that, other than an
4  accident and subsequent, short-lived physical impairment
5  during her childhood, Plaintiff has never had a physical
6  disability.  (Franco Dep. 47:19-24.)  That is not an
7  admission that Plaintiff was not disabled for purposes of
8  the FEHA, however.  The FEHA's definition of disability
9  is broad and should be construed as such.  Arteaga, 163
10  Cal. App. 4th at 342; Cal. Gov. Code § 12993(a) ("The
11  provisions of [the FEHA] shall be construed liberally for
12  the accomplishment of [its] purposes...").  Accordingly,
13  the Court will not consider Plaintiff's statement as an
14  admission that she was not disabled within the meaning of
15  the FEHA.

16

17    Construing FEHA's definition of "physical disability"
18  broadly, the Court finds that Plaintiff has satisfied her
19  burden on this element of her prima facie case.

20

21                **b. Plaintiff's Qualifications**

22    Plaintiff must prove that, despite her disability,
23  she was qualified to perform her duties as Defendant's
24  employee.  Arteaga, 163 Cal. App. 4th at 344-45; Faust,
25  150 Cal. App. 4th at 886.  It is uncontroverted that
26  Plaintiff had a record of poor performance evaluations
27  and that Plaintiff was aware that, as of September 2006,

28

1   Plaintiff knew that her supervisor, Camille Green, was

2   unhappy with Plaintiff's job performance.  (Def.'s UMF ¶

3   22-34, 38-44.)   There is no evidence here, however, that

4   demonstrates Plaintiff was unable to complete her job

5   functions due to her medical conditions.  In fact,

6   Plaintiff testifies that "all treatments and testing had

7   been done around [her] work schedule, or [she] had used

8   vacation-approved time, in order to avoid absence from

9   work."  (Franco Decl. ¶ 14.)   Based on this statement and

10  the lack of evidence to the contrary, the Court finds

11  that Plaintiff has satisfied her burden on this issue.

12

13                    **c. Causation**

14      Finally, Plaintiff must present sufficient evidence

15  that the Defendant terminated her employment because of

16  her disability.  Cal. Gov. Code 12940(a).

17

18      Plaintiff presents some evidence that Defendant

19  discharged her because of her medical condition.   It is

20  undisputed that some of Defendant's employees, as

21  discussed above, knew of Plaintiff's medical condition.

22  None of those employees who knew of Plaintiff's medical

23  condition, however, made the ultimate decision to

24  terminate Plaintiff's employment.  Plaintiff did not tell

25  Rudy Rios, who made the decision to terminate Plaintiff's

26  employment with Defendant Pier 1, anything about her

27  medical condition.  (Def's SUF ¶ 91.)   In fact, Mr. Rios

28

                              41

1    testified that, at the time he recommended that Plaintiff
2    be terminated, he was "unaware of Ms. Franco's absences
3    from work or any alleged medical condition." (Rios Decl.
4    ¶ 7.)  He also testified that "Ms. Franco's employment
5    with Pier 1 was terminated because of her unsatisfactory,
6    poor performance.  There were no other reasons for her
7    termination."  (<u>Id.</u> at ¶ 9.)

8

9        Plaintiff contends she need not have communicated
10   with Mr. Rios regarding her medical condition because her
11   prior communications with Ms. Coghlan and Ms. Green
12   impute notice on Defendant.  (Opp'n at 11.)  Next,
13   Plaintiff focuses on the uncontroverted fact that Mr.
14   Rios relied, in part, upon Ms. Green's assessment when
15   determining whether to discharge Plaintiff.  (Rios Dep.
16   68:14-25.)

17

18       To assess this argument, the Court relies on the
19   analysis in cases dealing with retaliatory employment
20   termination.  In these cases, courts have emphasized that
21   it is "[e]ssential... that the employer was aware that
22   the plaintiff had engaged in the protected activity."
23   <u>Morgan v. Regents of University of Cal.</u>, 88 Cal. App. 4th
24   52, 70 (2000)(quoting <u>Cohen v. Fred Meyer, Inc.</u>, 686 F.2d
25   793, 796 (9th Cir. 1982)).  Specifically, the plaintiff
26   must provide evidence that "decision-making officials"
27   who were responsible for the adverse employment action
28

were aware of the plaintiff's protected activities at the time they made the relevant decisions.  Mulhall v. Ashcroft, 287 F.3d 543, 552 (6th Cir. 2002).  Based on this analytical framework, the Court rejects Plaintiff's argument.

Mr. Rios was unaware of Plaintiff's medical condition at the time he made the recommendation to discharge her. This is critical evidence, both relevant and material to the Court's determination.  Plaintiff has presented no evidence that Mr. Rios himself knew of her medical condition or that he based his termination decision on her medical condition.  It is uncontroverted that Plaintiff never informed Mr. Rios of her medical condition, and his declaration that he knew nothing about it likewise is uncontroverted.  (Def's. UMF ¶ 91.)  The Court rejects Plaintiff's argument that the subjective knowledge on the part off some of Defendant's other employees regarding Plaintiff's medical condition should be imputed to Defendant; because Mr. Rios, the ultimate decision maker, was not aware of Plaintiff's medical condition.

Next, Plaintiff offers additional evidence of Defendant's alleged discriminatory reason for her termination.  Plaintiff testifies in her declaration that when she met with Ms. Green to discuss the January 4

incident, Plaintiff disclosed her bone marrow test
results her potential need for future hospitalization
depending on the outcome of future testing.  (Franco
Decl. ¶ 12.)  Plaintiff testified that, in response to
this disclosure, Ms. Green stated "with all that is going
on with your medical condition, maybe the best thing for
you is not to be working for Pier 1."  (Franco Decl. ¶
14.)  Plaintiff was discharged within days of her meeting
with Ms. Green on January 5, 2007.  (Def's. UMF ¶ 93.)

     The temporal proximity between an employee's
disclosure of a medical condition and a subsequent
termination can satisfy the employee's prima facie
causation requirement.  See Clark County Sch. Dist. v.
Breeden, 532 U.S. 268, 273 (2001) (temporal proximity of
the protected activity and the adverse employment action
must be very close); Davis v. Team Elec. Co., 520 F.3d
1080, 1094 (9th Cir. 2008) ("causation can be inferred
from timing alone where an adverse employment action
follows on the heels of protected activity." (citation
omitted)); Morgan, 88 Cal. App. 4th at 69-70; Arteaga,
163 Cal. App. 4th at 353.  "But temporal proximity alone
is not sufficient to raise a triable issue as to pretext
once the employer has offered evidence of a legitimate,
nondiscriminatory reason for the termination."  Arteaga,
163 Cal. App. 4th at 353.  Based on the evidence of Ms.
Green's statement, the Court will assume Plaintiff has

satisfied her prima facie burden and will consider this
temporal proximity argument after the Court evaluates
Defendant's nondiscriminatory reason for Plaintiff's
termination.

Plaintiff's offering of Ms. Green's alleged statement
presents enough evidence to satisfy Plaintiff's prima
facie burden on causation, notwithstanding the lack of
evidence that Ms. Green shared her knowledge of
Plaintiff's medical condition or any alleged feelings
that Plaintiff should no longer be employed by Defendant
because of her medical condition to Mr. Rios.  Plaintiff
has demonstrated "no more than the minimum necessary" on
this issue.  Wallis v. J.R. Simplot Co., 26 F.3d 885, 890
(9th Cir. 1994).

### 2. Defendant's Non-Discriminatory Reason

Once the plaintiff has established a prima facie
case, the burden shifts and the defendant must "provide a
legitimate, non-discriminatory reason for the employment
action."  Vasquez, 349 F.3d at 641.

Defendant offers declarations from each of the
employees that managed, overseen, or interacted in a
material way with Plaintiff during her employment with
Defendant.  (See Coghlan Decl.; Rebeil Decl.; Green
Decl.; Rios Decl.)  Also, Defendant offers declarations

of Rudy Rios, the distribution center Manager who
ultimately made the decision to terminate Plaintiff's
employment.  (See Rios Decl.)  In his declaration, Rios
states unequivocally he knew nothing about Plaintiff's
medical condition.  (See Rios Decl. ¶ 7.)

    In each of these declarations, Defendant's employees
repeat the same language: "I never discriminated against
Ms. Franco because of any physical or mental impairment
from which she may have suffered.  I did not make any
decision related to Ms. Franco based upon any physical or
mental impairment from which she may have suffered."
(Green Decl. ¶ 19; Coghlan Decl. ¶ 4; Moit Decl. ¶ 7;
Rebeil Decl. ¶ 3; Rios Decl. ¶¶ 7, 8.)

    The declarations of Defendant's other employees who
had a role in the decision to terminate Plaintiff's
employment repeat virtually identical reasons for
Plaintiff's termination: "Ms. Franco's employment with
Pier 1 was terminated because of her unsatisfactory, poor
performance.  There were no other reasons for her
termination."  (Coghlan Decl. ¶ 5; Rios Decl. ¶ 9.)

    These declarations present sufficient evidence by
Defendant of its non-discriminatory reason for
terminating Plaintiff's employment.  Defendant has

1  satisfied its burden by proving its legitimate non-
2  discriminatory reason for terminating Plaintiff.

3

4      **3. Plaintiff's Pretext Argument**

5      Plaintiff does not present a recognizable pretext
6  argument.  The Court, however, gathers from Plaintiff's
7  Opposition that she is attempting to argue two reasons
8  that Defendant's nondiscriminatory reason for terminating
9  Plaintiff was pretextual: (1) the allegedly disparate
10 treatment between Plaintiff and Reggie Smith, (Opp'n at
11 7-8); and, (2) Ms. Green's alleged statement to Plaintiff
12 on January 5, 2007 and its close proximity to the date of
13 Plaintiff's discharge.

14

15     As to Plaintiff's first contention, she argues that
16 the only reason the Defendant gave for her discharge was
17 her failure to open the distribution center on January 4,
18 2007.  (Opp'n at 8; <u>see</u> <u>also</u> Plaintiff's evidentiary
19 objections to Def's UMF ¶ 28, 29, 30, 31, 32, 33, 35, 36,
20 38, 39, 42, 45, 46, 47, 48, 49, and 50.)  Plaintiff then
21 presents uncontroverted evidence that another Pier 1
22 employee, Reggie Smith, had been guilty of the same type
23 of misfeasance and yet was not disciplined in any way.
24 (Rios Dep. 125:2-25, 126: 1-17.)  Plaintiff relies on
25 this disparity of treatment to demonstrate Defendant's
26 proffered nondiscriminatory reason for Plaintiff's
27 termination was pretextual.  (Opp'n at 8.)

28

1    This argument fails for two reasons.  First,
2  Plaintiff's own deposition testimony contradicts her
3  contention here that the only basis for her discharge was
4  her failure to open the distribution center on January 4,
5  2007.  (Franco Dep. 231:21-25, 232:1-2.)  Plaintiff
6  conceded she was terminated from her employment with Pier
7  1 due to her poor job performance <u>as well as</u> the January
8  4 incident.  (<u>Id.</u> (emphasis added).)  In other words,
9  there were two reasons given for Plaintiff's discharge,
10  both arising from Plaintiff's continued poor job
11  performance.  (<u>Id.</u>)  Plaintiff presents evidence to show
12  that one reason, her failure to open the distribution
13  center, is pretextual but fails to address the other
14  reason, her prior record of poor performance.
15
16    Moreover, Defendant successfully rebuts Plaintiff's
17  argument, by demonstrating that Reggie Smith and
18  Plaintiff were not similarly situated and that the
19  disparate treatment was warranted.  (<u>See</u> Moit Decl. ¶
20  10.)  Reggie Smith, a weekend manager, failed to open the
21  distribution center on a single occasion because he
22  "inadvertently overslept," but nevertheless reported to
23  work one hour late.  (<u>Id.</u> at ¶ 9.)  Mr. Smith was not
24  disciplined for his failure to open the distribution
25  center.  (<u>Id.</u> at ¶ 11.)  Defendant points to the
26  differences between Mr. Smith and Plaintiff to explain
27  why Mr. Smith was not disciplined, i.e., Mr. Smith had
28

1   been employed by Defendant for eight years and unlike
2   Plaintiff, had a  prior good job performance record.
3   (Id. at ¶ 11.)  Also, Mr. Smith "had already been
4   selected to transfer to Pier 1's new Distribution Center
5   in Du Pont, Washington." (Id.)  The Court finds
6   persuasive Defendant's argument persuasive that Plaintiff
7   and Mr. Smith were not similarly situated.  Accordingly,
8   Defendant has successfully rebutted Plaintiff's pretext
9   argument regarding Reggie Smith.
10
11       Plaintiff again relies on the alleged statement by
12   Ms. Green to Plaintiff on January 5, 2007, this time in
13   an effort to show Defendant's proffered legitimate
14   reasons for discharge are pretextual.  Plaintiff argues
15   that the statement demonstrates pretext because it was
16   made so close in time to the termination of her
17   employment.  "[T]emporal proximity alone is not
18   sufficient to raise a triable issue as to pretext once
19   the employer has offered evidence of a legitimate,
20   nondiscriminatory reason for the termination." Arteaga,
21   163 Cal. App. 4th at 353; see also Smith v. Allen Health
22   Systems, Inc., 302 F.3d 827, 833-34 (8th Cir. 2002);
23   Annett v. University of Kansas, 371 F.3d 1233, 1241 (10th
24   Cir. 2004).  Thus, Plaintiff's argument fails.
25
26       As noted above, Plaintiff admitted in her deposition
27   that no one at Pier 1 said anything negative to her about
28

her medical condition before her discharge.  Although the
Court must draw all reasonable inferences in favor of the
non-moving party, in this case, the Court cannot
interpret Ms. Green's alleged statement in the fashion
Plaintiff urges because the statement is ambiguous.  As
defense counsel correctly pointed out during the hearing
on this motion, the Court must draw only reasonable
inferences in favor of Plaintiff; it is not reasonable to
infer that Ms. Green's ambiguous statement is a proper
basis upon which to find a triable issue of fact as to
whether Defendant's nondiscriminatory reasons for
Plaintiff's discharge were pretextual.  Furthermore, as
also discussed above, Ms. Green was not the ultimate
decision maker and there is no evidence that her
knowledge of Plaintiff's medical condition was shared
with anyone who made the decision to discharge Plaintiff.
Plaintiff's arguments that Defendant's nondiscriminatory
reasons for discharging Plaintiff are pretextual fail as
a matter of law to raise a triable issue of fact.

## VII. CONCLUSION

For the foregoing reasons, Defendant's Motion for
Summary Judgment is GRANTED.

**IT IS SO ORDERED.**

Dated:  September 11, 2008

VIRGINIA A. PHILLIPS
United States District Judge

50